[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This dissolution of marriage action was filed in New London Superior Court on January 30, 2001. The complaint seeks; dissolution of the marriage; joint legal custody of the minor children (prior to trial, one of the two minor children reached the age of majority); child support; exclusive use and possession of the marital home; assignment of interest in the marital home; allocation of debt; and such other relief as the court deems fair and equitable.
The defendant filed a cross complaint on February 2, 2001, admitting all of the allegations in the complaint and seeking the following; dissolution of the marriage; joint custody of the minor child; child support; assignment of interest in the marital home; allocation of debt; equitable division of assets; and such other relief as the court deems equitable.
The issue of custody was referred to Family Relations by stipulation of the parties filed with the court on February 20, 2001. As a result of such referral, a custody evaluation report was completed by Maret DiGangi and filed with the court on September 27, 2001. Attorney William McCoy filed an appearance on June 4, 2001 as guardian ad litem for the minor children. Timothy Lenes, Esq., was appointed by the court as attorney for the minor children on November 13, 2001. Both parties successfully completed the Parenting Education Program as evidenced by certificates filed with the court on March 21, 2001.
A fully contested trial was held in Norwich Superior Court commencing on March 20, 2002. Eight witnesses testified at trial; Maret DiGangi, a family relations counselor; Sandy Cross, a school nurse to both children; John Gavitt, brother to the defendant; Mr. Alfiero, a family acquaintance; Teresa Materas, a retirement officer at Electric Boat; Attorney William McCoy, guardian ad litem for the minor child; and the parties. From their testimony and all of the exhibits introduced at trial, the court finds the facts that follow.
The parties were intermarried on March 21, 1981 in Westerly, Rhode Island. Two children are issue of the marriage; Meghan M. Gavitt, born February 27, 1984, and Timothy L. Gavitt, born January 18, 1989. Meghan CT Page 9073 reached the age of eighteen before the trial began; thus, the custody issue centered solely around Timothy.
The parties acquired the marital home on 57 Lathrop Avenue in Pawcatuck (Stonington), Connecticut in 1986 after the sale of their first marital home on 17 Courtland Street, Pawcatuck, Connecticut. 17 Courtland Street was originally purchased by the defendant in October of 1977 for the sum of $33,000.00. The property was subsequently deeded to both parties, as tenants by the Entirety by warranty deed recorded at Stonington in June of 1985. 17 Courtland was sold by the parties in 1986, realizing a net gain of approximately $69,000.00. Said net gain was used toward the purchase of 57 Lathrop Avenue, the current marital residence. 57 Lathrop Avenue has a fair market value of approximately $200,000.00. The property is encumbered by a mortgage of approximately $33,000.00. The total monthly payment for mortgage and taxes is just over $800.00 per month. Each party has asked the court to retain possession of the marital home.
The plaintiff is 42 years old and a high school graduate. There was no evidence of any significant health problems. In the early years of the marriage, the plaintiff worked at Electric Boat. She left that job in 1990 in order to stay at home with the family's children. She began her current job as a secretary in the Stonington public school system in 1995. This job affords her five weeks off in the summer, otherwise she follows the public school schedule getting vacation when the children are out of school. She took this job in order to maximize her time with the children. The plaintiffs yearly earnings of approximately $24,000.00 average to be $460.00 per week gross ($340.00 net per week). The court has used such figures in its financial calculations.
The defendant is now age 55 years old, has a high school diploma and did receive some technical training in the 60's. The defendant has high blood pressure for which he takes medication. The defendant was hospitalized in the early 90's on two occasions, the second of which was to reverse a procedure done at his first hospitalization. These conditions, however, have not affected his employability. The defendant has been continually employed at Electric Boat for the past 33 years. He originally worked as a silver brazer but in 1990 he secured his present position as business agent for the Metal Trade Council where he is the appointed chief steward. The defendant has no set job functions at Electric Boat except to represent the union, yet he is paid a salary by Electric Boat. He has a flexible schedule in that he may work any 40 hours from Monday through Friday in any week. He usually maintains a 7:00 a.m. to 3:00 p.m. schedule. The Pipefitters Union also pays the defendant a salary. These two regular sources of income are listed on the defendant's financial affidavit as a gross weekly wage of $1,032.00 ($701.00 net weekly wage). The court notes that in 2001 the defendant CT Page 9074 received an additional sum of approximately $1,700.00 from Electric Boat for unused vacation. He receives travel reimbursement from the union, which currently amounts to approximately $100.00 per month. The defendant, on occasion, may receive additional funds from his union employment. For example, in 2001, the union voted to give each of the delegates, one of whom was the defendant, a $1,500.00 payment.
The defendant began a lawn, leaf and plowing business in 1988 with his brother. He quit the business in the Spring of 2001. He presently owns two large mowers, a dump truck, a plow and other equipment with a present value of over $5,000.00. The defendant grossed over $16,000.00 in said business in 2000, but due to taking a $9,000.00 depreciation, only showed a profit of $1,250.00.
Based on these factual findings, the court finds that the defendant understated his earnings on his financial affidavit as submitted on the day of trial. The court has assigned him an earning capacity of $1,150.00 per week gross pay (net $800.00 per week) and has used such amount in its financial calculations.
The major financial assets of the parties and the court's findings related to such assets are as follows:
CHILDREN'S SAVINGS BONDS their present value is approximately $9,000.00. The court notes that this asset was accumulated and funded during the marriage.
TWO CHELSEA GROTON CD'S jointly owned; their present value is approximately $10,000.00. The court notes that this asset was accumulated and funded during the marriage.
CHARTER OAK SAVINGS jointly owned; its present balance is approximately $7,000.00. The court notes that this asset was accumulated and funded during the marriage.
CHELSEA GROTON SAVINGS jointly owned; its present balance is approximately $2,000.00. The court notes that this asset was accumulated and funded during the marriage.
CHARTER OAK CHECKING jointly owned; its present balance is approximately $1,500.00. The court notes that this asset was accumulated and funded during the marriage.
The defendant's Electric Boat Hourly Rate Employees' RetirementPlan-Groton; the current benefit the defendant has earned is approximately $1,300.00 per month payable at age 65. The court notes that CT Page 9075 the defendant has had this plan since 1969. The court also notes that in March of 1981, the benefit earned was approximately $125.00 per month. The court further notes that the defendant's actual benefit payable at age 65 is likely to increase by up to $94.00 per month.
The defendant's General Dynamics Savings and Stock Investment Plan; its present value is approximately $172,000.00. The court notes that over 99% of this asset's value and funding occurred during the marriage. The court further notes that this plan is funded by both the employee's and employer's contributions.
The defendant's United Association of Pipefitters Retirement; the current benefit the defendant has earned is approximately $630.00 per month at age 65. The court notes that this asset was accumulated and funded during the marriage.
The plaintiff claims that the marriage began to change for the worse "many years ago." She says that the defendant was not "emotionally there" for her; that he often treated her in a disparaging and dismissive manner in private and in public; and that their sex life diminished to the point that the plaintiff left the marital bedroom permanently in 1999. She stated that she tried to keep the marriage together but when the suggestion of counseling came up, the plaintiff said that the marriage was "already gone." She described the last eight years of the marriage as "loveless."
The defendant claimed that the marriage broke down because the plaintiff "fell out of love with him." He further stated that he and the defendant had little in common and that they did not communicate effectively. The defendant said that he had no idea as to what he may have done to cause the breakdown and he admitted that there was little real effort by either party to reconcile their differences.
The court finds that the marriage finally broke down irretrievably in 1999 when the plaintiff left the marital bedroom. The parties simply sat by and watched it fall apart. The court finds that the parties are equally responsible for the marriage's demise.
The parties' minor child Timothy is 13 years old. He will begin the eighth grade in September 2002. He is in good health and requires no special needs. Tim is an excellent student who has consistently achieved A's and B's on his report cards. He enjoys sports and car racing and both of his parents are involved in and support his outside activities. Despite the fact that the parties were losing their affection for each other, they appeared able to shield their son from that fact. Tim enjoyed a loving relationship with both his parents. CT Page 9076
Things began to change in 1999. The defendant allowed Timothy to sleep in the marital bedroom on a nightly basis for well over a year. This occurred just after the plaintiff stopped occupying such bedroom. This began a pattern of behavior by the defendant which drove a wedge between Timothy and the plaintiff, minimized the plaintiffs parental role, and put Timothy in a position of choosing one parent or the other. During this period, the defendant refused to communicate with the plaintiff on parenting decisions, nor would he support the plaintiff in her parenting decisions. This created an atmosphere which empowered Timothy in a way that was not in his best interest.
The situation worsened after the divorce was filed in January 2001. The topic of which parent Tim preferred to live with came up much too often and in too many circles. Although the plaintiff is not blameless in this regard, the defendant placed far more importance on the topic and did nothing to discourage his son from expressing his parental preference to friends and family. Timothy began to disobey and confront his mother more openly and without consequence. Tim's grades went from A's and B's to B's and C's. Faced with these and other facts, the defendant refused to acknowledge that his son was being adversely affected by the pending divorce and the environment in which he was living. The defendant explained Tim's poor attitude toward the plaintiff by claiming that she was too excessive in her demands of her son. He went so far as to say that Timothy "despised" his mother. This claim was unsupported by any evidence adduced at trial.
The defendant created an environment that had a substantial negative impact on the relationship between Timothy and his mother. The stress and tension created by such an antagonistic living arrangement was not in the best interests of the minor child. It is unfortunate that the defendant chose to proceed in this manner. The evidence was clear that he is otherwise a proud and loving father and that the plaintiff is a capable and loving mother.
Timothy expressed a desire to live primarily with his father to a number of witnesses who testified at the trial. The court has given such desire due consideration in light of all of the evidence and the totality of the circumstances.
Attorney Lenes proposed that the parties share joint legal custody of Timothy with the defendant's home considered the primary physical residence. His proposal outlines a broad access schedule for the plaintiff.
The guardian ad litem, Attorney McCoy, proposed a shared custody CT Page 9077 arrangement in accordance with the proposal recommended by the Family Relations Evaluation. Mr. McCoy testified that Tim wanted to live predominantly with the defendant, however, he did note that on one occasion Timothy indicated that he did not want to make a decision as to which parent he wanted to live with.
Maret DiGangi, the family relations evaluator, recommended shared joint legal and physical custody of Timothy. She further recommended a two-week rotation schedule which affords equal access time with both parties. She expressed some concern that if the defendant had primary custody then the plaintiffs role in Timothy's life would diminish further. Ms. DiGangi felt that primary residence with the defendant would not be in the best interest of Timothy.
The court finds that it has jurisdiction; that the complaint was properly served; that the matter has been pending for more than 90 days; one of the parties resided in the State of Connecticut for one year prior to the filing of this action. The other allegations in the complaint are proved, including the fact that the marriage has irretrievably broken down. The court will dissolve the marriage based on such breakdown.
The court has found this case to be particularly difficult to decide. In entering all of its orders, the court has given careful consideration to all of the evidence presented at trial. It has attempted to balance the equities fairly and fashion its orders in a way that considers the entire picture. It has taken into account the best interests of the minor child as defined by statute and explained by our appellate courts. The court has considered the application of all of the relevant statutes including Connecticut General Statutes §§ 46b-40, 46b-56, 46b-62, 46b-81
and 46b-82 in making the orders that follow.
 ORDERS
1. REAL PROPERTY
The parties shall list 57 Lathrop Avenue, Stonington, Connecticut for sale to a third party only, with a licensed realtor at a mutually agreed upon price. Upon sale, the parties shall divide the net proceeds equally. "Net proceeds" are defined as the gross sales price minus the sum of the following; current mortgage balance, adjustments for taxes and insurance, the broker's fee and reasonable attorney's fees.
The court shall retain jurisdiction over the real property in this order to ensure that the purpose and intent of this order concerning said property is carried out. The court shall determine the listing price, sales price and terms of sale upon any disagreement of the parties. CT Page 9078
All costs associated with maintaining said property shall be divided equally until sale, including but not limited to mortgage, taxes and necessary repairs.
Occupancy of the marital residence shall continue as ordered by the court on March 20, 2002 (Attachment A) until said residence is sold.
2. CUSTODY
The parties shall share joint legal and physical custody of the minor child, Timothy. The defendant's residence shall be Timothy's designated residence for school purposes only. Each party shall have physical custody of Timothy on an alternating weekly schedule. Said weekly schedule shall be from 10:00 a.m. Saturday until 10:00 am. on the following Saturday. The party with physical custody shall be responsible for transportation of the minor child to begin his week with the other party. This schedule is subject to any reasonable agreement of the parties and to the following exceptions;
 a. Every Wednesday (Wednesday Visitation Order) the non-custodial parent shall have visitation with Timothy from 4:00 p.m. until 8:00 p.m. The visiting parent shall be responsible for transporting Timothy from and to his physical residence.
 b. Beginning in 2003, during school's summer vacation, either party may take one week from the other party, thus giving the taking party three consecutive weeks with the minor child. Notice of which week will be taken, must be communicated to the other party no later than May 15 of that year or the party shall forfeit said week.
 c. Regardless of who is the custodial parent, Mother's Day shall always be spent with the plaintiff and Father's Day shall always be spent with the defendant.
 d. The parties shall alternate physical custody of Timothy on the major holidays according to the following schedule and regardless of who the custodial parent is for that week;
1. EVEN YEARS
The plaintiff shall have physical custody of Timothy on Easter, Labor Day, Christmas Day and New Year's Eve. The defendant shall have physical custody of Timothy on New Year's Day, Memorial Day, Thanksgiving and Christmas Eve. CT Page 9079
2. ODD YEARS
 The plaintiff shall have physical custody of Timothy on New Year's Day, Memorial Day, Thanksgiving and Christmas Eve. The defendant shall have physical custody of Timothy on Easter, Labor Day, Christmas Day and New Year's Eve.
e. The Wednesday Visitation Order shall not apply in the following situations:
 1. when Christmas Eve, Christmas Day, New Year's Eve or New Year's Day is on a Wednesday
 2. during Summer Vacation, if the custodial parent and the minor child are away on vacation.
3. CHILD SUPPORT
Beginning July 22, 2002 the defendant shall pay to the plaintiff child support in the amount of $120.00 per week. Said sum shall be secured by contingent wage withholding. The presumptive child support amount according to the Connecticut Child Support Guidelines is $220.00 per week. The defendant's share of the presumptive amount is 70% or $154.00 per week. The court has deviated from said presumptive amount in accordance with 46b-215a-3 (b)(6)(A)(i) of said Guidelines.
4. HEALTH INSURANCE
The defendant shall maintain health insurance for his minor child as is available through his employment. Each party shall maintain his/her own health insurance through their respective employers at their own cost.
Unreimbursed medical and dental expenses for the minor child shall be divided by the defendant paying 60% and the plaintiff 40% of such costs. Such a division is found to conform to the Connecticut Child Support Guidelines.
5. DAY CARE
Qualified Day Care Costs as defined by the Connecticut Child Support Guidelines shall be divided by the defendant paying 60% and the plaintiff 40% of such costs. Such a division is found to conform with said Guidelines.
6. DEPENDENCY EXEMPTION
CT Page 9080
The parties shall claim the minor child as a dependent for Federal and State income tax purposes in alternate years. The plaintiff shall claim such exemption when the tax is due in an even-numbered year, and the defendant shall claim the exemption when the tax is due in an odd-numbered year.
7. ALIMONY
Beginning July 22, 2002 the defendant shall pay to the plaintiff alimony in the amount of $100.00 per week for eight years. Said alimony is non-modifiable as to term only and shall terminate sooner on the first occurrence of any one of the following events;
a. death of either party
b. remarriage by the plaintiff
c. cohabitation by the plaintiff.
8. LIFE INSURANCE
Each party shall maintain a life insurance policy in the amount of $100,000.00, name Timothy as beneficiary, and name the surviving spouse as Trustee. Said policies shall be maintained until the minor child reaches the age of 18 years. Each party shall execute authorization for the other to verify the status of said policies.
The defendant shall maintain the plaintiff as beneficiary of his two Electric Boat life insurance policies listed on his financial affidavit (total benefit $45,000.00) for so long as he is obligated to pay alimony.
9. GENERAL DYNAMICS SAVINGS AND STOCK INVESTMENT PLAN
The defendant shall transfer to the plaintiff by way of Qualified Domestic Relations Order (QDRO) 50% of the March 20, 2002 value of his General Dynamics SSIP. Said QDRO shall be prepared by the plaintiffs attorney. The plaintiff shall be responsible For any tax consequences from such transfer. The plaintiff shall pay for the cost to prepare the QDRO. The court shall retain jurisdiction to ensure that the purpose and intent of this paragraph is carried out and the court shall have the authority to modify this paragraph if required to comply with the instructions of the plan administrator.
10. ELECTRIC BOAT HOURLY RATE EMPLOYEE'S RETIREMENT PLAN-GROTON
CT Page 9081
The defendant shall transfer to the plaintiff by way of QDRO 40% of the March 20, 2002 value of his E.B. Hourly Rate Retirement Plan. Said QDRO shall be prepared by the plaintiffs attorney. The plaintiff shall be responsible for any tax consequences from such transfer. The plaintiff shall pay for the cost to prepare the QDRO. The court shall retain jurisdiction to ensure that the purpose and intent of this paragraph is carried out and the court shall have the authority to modify this paragraph if required to comply with the instructions of the plan administrator.
11. UNITED ASSOCIATION OF PIPEFITTER'S RETIREMENT
The defendant shall transfer to the plaintiff by way of QDRO, 25% of the March 20, 2002 value of his United Association of Pipefitter's Retirement. Said QDRO shall be prepared by the plaintiffs attorney. The plaintiff shall be responsible for any tax consequences from such transfer. The plaintiff shall pay for the cost to prepare the QDRO. The court shall retain jurisdiction to ensure that the purpose and intent of this paragraph is carried out and the court shall have the authority to modify this paragraph if required to comply with the instructions of the plan administrator.
12. a. CHARTER OAK CHECKING
b. CHARTER OAK SAVINGS
c. CHELSEA GROTON SAVINGS
The parties shall divide the balances in these accounts equally.
13. CHELSEA GROTON CD'S
The parties shall divide the value of these two CD's equally. If the parties agree, they may choose a mutually agreeable date to redeem the CD's. If the parties cannot agree on a date, the CD's shall be redeemed on October 1, 2002 and the proceeds and penalties shared equally by the parties.
14. CHILDREN'S SAVINGS BONDS
The parties shall disburse one-half of the present value of the children's U.S. Savings Bonds to each child as needed for his/her education. The party who is to disburse the funds must notify the other prior to any such disbursement.
15. OTHER SAVINGS AND CHECKING ACCOUNTS
CT Page 9082
Any savings or checking accounts not specifically referred to in these orders shall be retained by the party in whose name they are held. If any such accounts are joint, they shall be divided equally between the parties.
16. OTHER PENSION OR RETIREMENT PLANS
Any retirement or pension plans not specifically referred to in these orders shall be retained by the party who is the owner or beneficiary of such plans.
17. AUTOMOBILES
The plaintiff shall retain ownership of the 1996 Chevrolet Blazer with all of its encumbrances and liabilities. The defendant shall retain possession of the 1978 Chevrolet dump truck, the 1969 Chevrolet Nova and the 1997 Dodge Ram with all of their encumbrances and liabilities.
18. ATTORNEY'S FEES
Attorney William McCoy's fee of $5,220.00 shall be paid 70% by the defendant and 30% by the plaintiff
Attorney Timothy Lenes' fee of $5,556.25 shall be paid 70% by the defendant and 30% by the plaintiff.
Each. party shall be responsible to pay his/her own attorney's fees.
19. PERSONAL PROPERTY
The defendant shall retain possession of the following lawn business equipment; the 52" mower, the 48" mower, two blowers and the plow. The plaintiff shall retain possession of the following items; the dog, the washer and dryer, the doll collection, the basket/bobbin collection and the stereo with CD's.
All other personal property shall be divided equitably by the parties. Any disputes shall be submitted to binding mediation. The cost of any such mediation shall be shared equally by the parties.
20. DEBT
The parties shall each pay 50% of the balance on the VISA card listed on both financial affidavits. CT Page 9083
Scarpllino, J.
[EDITORS' NOTE: ATTACHMENT A IS ELECTRONICALLY NON-TRANSFERRABLE.]